UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ANDREAK KING,

Plaintiff,

v.

BARRY VIRTS, F. CRANE, C. VERPLANK, R. MORRISON, J. HENDLER,

Defendants.

---

**DECISION AND ORDER**

6:18-CV-6023 EAW

## INTRODUCTION

Plaintiff Andreak King ("Plaintiff") initiated this action *pro se* on January 9, 2018. (Dkt. 1). After amending the complaint several times, Plaintiff submitted a fourth amended complaint asserting several claims pursuant to 42 U.S.C. § 1983 related to his confinement at the Wayne County Jail (the "Jail") which remain pending against former Wayne County Sheriff Barry Virts ("Sheriff Virts"), F. Crane ("Sgt. Crane"), C. Verplank ("Sgt. Verplank"), R. Morrison ("Sgt. Morrison"), and J. Hendler ("Sgt. Hendler") (collectively, "Defendants"). (Dkt. 52). Pending before the Court is Defendants' motion for summary judgment. (Dkt. 101). For the following reasons, Defendants' motion is granted in part and denied in part.

# BACKGROUND

## I. Factual Background

The following facts are taken from Defendants' Statement of Undisputed Facts (Dkt. 101-1), the exhibits annexed to Defendants' motion, and the fourth amended complaint (Dkt. 52). Plaintiff did not submit an opposing statement of material facts or otherwise respond to Defendants' motion and therefore the facts in Defendants' statement may be "deemed admitted for purposes of the motion" to the extent they are supported by admissible evidence in the record.[1] *See* Loc. R. Civ. P. 56(a)(2).

Plaintiff was held at the Jail as a pretrial detainee from March 18, 2016, until March 19, 2018, when he pled guilty to his pending criminal charges, and then from November 26, 2019, to January 13, 2020, and a third time from April 12, 2021, to September 29, 2022. (Dkt. 101-1 at ¶¶ 6-8). Plaintiff has several mental health conditions, including post-traumatic stress disorder, anxiety, and depression. (Dkt. 53 at ¶ 15; Dkt. 101-1 at ¶¶ 32, 43, 241). Upon Plaintiff's first admission to the Jail in March 2016, he underwent a

---

[1] The Court cites to the fourth amended complaint to provide relevant background information as Plaintiff did not respond to the summary judgment motion. *See Gil-Cabrera v. City of New York*, No. 20-CV-9493-LTS-SDA, 2023 WL 2601132, at *1 n.1 (S.D.N.Y. Mar. 22, 2023) ("[W]hile the Court recites Plaintiff's allegations to provide relevant background, all facts are drawn from Defendant's submissions, including . . . Defendant's declarations and Local Civil Rule 56.1 statement, to which Plaintiff failed to respond."). "[I]t is of course fundamental that allegations in a complaint are not 'evidence' that can defeat a motion for summary judgment." *Hernandez v. Coca Cola Refreshments USA, Inc.*, No. 12 CIV. 234 BMC, 2013 WL 6388654, at *3 (E.D.N.Y. Dec. 6, 2013). But Plaintiff's fourth amended complaint is verified and may therefore "be treated as an affidavit for summary judgment purposes" and to determine "whether material issues of fact exist." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).

behavioral health assessment and was evaluated to be a moderate risk of harm to himself and others. (Dkt. 101-1 at ¶ 10).[2]

While at the Jail, Plaintiff received regular individual counseling sessions from Wayne County Behavioral Health Network personnel. These counseling sessions occurred approximately monthly during Plaintiff's first seven months at the Jail (*id.* at ¶¶ 11-36) but increased to multiple sessions each week on a near daily basis from November 7, 2016, until December 29, 2017 (*id.* at ¶¶ 39-232). Plaintiff did not receive a mental health counseling session from June 28 through September 20, 2016, or December 29, 2017, through March 19, 2018, when he was transferred to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (*See* Dkt. 101-1 at ¶¶ 16-31; 232-38). Plaintiff was also seen by a psychiatrist roughly a dozen times at the Jail during his first stint, which often resulted in changes to his prescribed medications. (*Id.* at ¶¶ 15, 33, 35, 43, 47, 58, 61, 70, 83, 94, 109, 227). The first time Plaintiff saw a psychiatrist during this stint was on September 27, 2016, and the last time was on December 19, 2017. (*Id.* at ¶¶ 32, 227).

---

[2] The Court previously granted Defendants' motion to seal certain exhibits submitted in support of their motion for summary judgment. (Dkt. 100). As a result, Defendants filed redacted copies of certain exhibits (*see* Dkt. 101-9; Dkt. 101-11; Dkt. 101-12; Dkt. 101-13; Dkt. 101-16; Dkt. 101-17) and sent unredacted versions of the sealed exhibits directly to Chambers. Therefore, while the Court has reviewed the entirety of the summary judgment papers submitted by Defendants (both publicly-filed and sealed documents), it has refrained from specifically citing to the sealed documents for purposes of this Decision and Order. That said, Defendants' statement of undisputed facts (Dkt. 101-1) was filed publicly and is properly supported by the evidence of record (both publicly filed and sealed). Accordingly, when appropriate, the Court has cited to the statement of undisputed facts for certain factual recitations contained herein.

During Plaintiff's first stint at the Jail, from March 18, 2016, to March 19, 2018 (731 days), he was regularly disciplined for behavioral violations, usually violence, making threats, or other disorderly conduct, and was either found guilty after a hearing or pleaded guilty. (*Id.* at ¶¶ 17-237). Plaintiff was typically sanctioned for these violations with a range of 10 to 90 days in keeplock, a form of isolated confinement, which cumulatively amounted to an approximate total of 750 days. (*Id.*). Plaintiff alleges he was kept in "continuous keep-lock/solitary confinement status" for the duration of his initial confinement at the Jail. (Dkt. 52 at ¶ 16).

The record shows that Plaintiff attempted to commit suicide or otherwise hurt himself on three occasions: October 3, 2017, November 3, 2017, and November 22, 2017. (Dkt. 101-1 at ¶¶ 170, 196, 206; Dkt. 101-16 at 84-93). On November 3 and November 22, 2017, a physical altercation erupted between Plaintiff and the responding corrections officers. (Dkt. 101-1 at ¶¶ 170, 196, 206-09). Plaintiff was eventually handcuffed, shackled, and removed from his cell to be placed on constant watch after each attempt.[3] (Dkt. 101-1 at ¶¶ 171, 196, 210; Dkt. 101-15 at 26-35). Only mental health staff could clear a prisoner from constant watch. (Dkt. 101-1 at ¶ 173).

During the November 22, 2017, incident, Defendants assert that Plaintiff tried to attack Sgt. Crane after the corrections officers responded to his cell. (*Id.* at ¶ 207; Dkt. 101-12 at 84-89). The officers restrained Plaintiff with the application of pepper spray,

[3] Sgt. Crane testified that "constant watch" is "the unobstructed visibility and period of watching a person one-on-one in a cell" and an inmate may be transferred to constant watch so that "he can't hurt himself." (Dkt. 101-8 at 27, 82).

handcuffs, and shackles, and escorted Plaintiff to constant watch, where he had his clothes removed and was placed in a "behavioral modification suit." (Dkt. 101-1 at ¶ 207; Dkt. 101-12 at 84-94). According to Defendants, Plaintiff made several threats to the corrections officers during this process. (Dkt. 101-12 at 84-104).

Plaintiff presents a different account of this incident in his fourth amended complaint. He alleges that he lost consciousness during the suicide attempt and when he regained consciousness he was handcuffed and shackled to his bed and Sgt. Crane held him in a headlock that restricted his ability to breathe. (Dkt. 52 at ¶ 19). Plaintiff also alleges that Sgt. Crane directed other corrections officers to beat Plaintiff and apply mace during this altercation. (*Id.*).

Plaintiff was transferred out of the Jail and into DOCCS custody on March 19, 2018, when he pleaded guilty to his pending criminal charges. (Dkt. 101-1 at ¶¶ 6, 238). Plaintiff returned to the Jail on November 26, 2019, and remained there until January 13, 2020. (*Id.* at ¶ 239). During this second stint, Plaintiff was not charged with any misconduct, and he received a mental health assessment upon arrival and seven individual counseling appointments. (*Id.* at ¶¶ 239-50). Because there were no incidents of misconduct, Plaintiff did not receive a keeplock sanction during this period.

Plaintiff returned to the Jail for a third stint on April 12, 2021, and remained there until September 29, 2022. (*Id.* at ¶ 251). Upon admission, Plaintiff underwent a mental health evaluation and the Wayne Behavioral Health Network prepared a jail treatment plan. (*Id.* at ¶¶ 252-54). Plaintiff continued to receive mental health counseling with multiple counseling sessions occurring each week. (*Id.* at ¶¶ 255-381). During the third stint,

Plaintiff pleaded guilty or was found guilty of engaging in violent conduct, threats, or disorderly conduct and received keeplock sanctions ranging from three to twenty-five days, for an approximate cumulative total of 143 days in keeplock. (*Id.* at ¶¶ 267-72, 291, 309, 314, 334-35, 338, 343, 347, 356). Plaintiff was only disciplined with a keeplock sanction one time after the New York State Humane Alternatives to Long-Term Solitary Confinement Act ("HALT Act") went into effect on March 31, 2022. (*See id.* at ¶¶ 352, 356; Dkt. 101-26).

On January 9, 2022, Plaintiff was transported to the Newark Wayne Community Hospital due to complaints of coughing up blood and chest tightness. (Dkt. 101-1 at ¶ 336). At the hospital, Plaintiff had an EKG and chest x-ray performed and was diagnosed with a respiratory infection. (*Id.*; Dkt. 52 at ¶ 24). The hospital discharged Plaintiff back to the Jail the same day. (Dkt. 101-1 at ¶ 336).

## II. **Procedural Background**

Plaintiff initiated this action *pro se* and the Court granted him leave to proceed *in forma pauperis*. (Dkt. 1; Dkt. 16). After receiving *in forma pauperis* status, Plaintiff filed three amended complaints in quick succession. (Dkt. 17; Dkt. 18; Dkt. 19). The Court permitted Plaintiff to proceed on his third amended complaint, which claimed that corrections officers at the Jail violated his Eighth Amendment right against cruel and unusual punishment due to his confinement in keeplock. (Dkt. 23; Dkt. 19). Defendants answered the third amended complaint after service was completed by the United States Marshals Service. (Dkt. 25).

On November 19, 2021, United States Magistrate Judge Mark W. Pedersen appointed *pro bono* counsel for Plaintiff for the limited purpose of preparing a fourth amended complaint. (Dkt. 38). Through *pro bono* counsel, Plaintiff filed a fourth amended complaint on December 8, 2022, which remains the operative pleading. (Dkt. 52). Judge Pedersen also granted Plaintiff's requests for the appointment of *pro bono* counsel to help him complete discovery. (Dkt. 56; Dkt. 62).

Discovery closed on September 9, 2024. (Dkt. 79). Plaintiff filed a letter with the Court on March 18, 2025, which Judge Pedersen construed as another request for the appointment of *pro bono* counsel, and denied the request without prejudice. (Dkt. 97; Dkt. 98).

Defendants moved for summary judgment on April 28, 2025. (Dkt. 101). Plaintiff received the notice to *pro se* litigants regarding Rule 56 motions for summary judgment. (Dkt. 101-28). Plaintiff then filed a letter requesting an extension of time to respond to the motion, permission to file a fifth amended complaint, and reconsideration of Judge Pedersen's denial of additional *pro bono* counsel. (Dkt. 103). The Court granted Plaintiff's requested extension and required that Plaintiff's response to the summary judgment motion be filed on or before August 18, 2025, but denied his other requests. (Dkt. 106).

Plaintiff did not respond to the summary judgment motion by the deadline but submitted a letter after the August 18 deadline lapsed stating that he "just want[ed] to just let this case go." (Dkt. 107). The Court requested Plaintiff clarify whether the letter was intended to serve as a request to discontinue the action. (Dkt. 108). Plaintiff responded with a letter suggesting he intended to continue his claims and requested appointment of

counsel. (Dkt. 109). The Court accepted Plaintiff's representation that he wanted to continue this action but denied his renewed request for appointment of counsel without prejudice. (Dkt. 111). The Court also noted that the deadline to respond to the summary judgment motion had long since passed and the motion would be taken under advisement. (*Id.*).

## DISCUSSION

## I. Legal Standards

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find for that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec*., 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

### B. Constitutional Standards

#### 1. Eighth Amendment

"Under the Eighth Amendment, a 'prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate' is unlawful." *Sinnott v. Smith*, 743 F. Supp. 3d 504, 518 (W.D.N.Y. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). "To establish an Eighth Amendment violation, an inmate must show: '(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

As to the objective element, a prisoner "may not be deprived of their basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health." *Id.* (citation modified). This "includes the risk of serious damage to 'physical and mental soundness[.]'" *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)).

"As for the subjective requirement, deliberate indifference requires 'more than mere negligence.'" *Jabbar*, 683 F.3d at 57 (quoting *Farmer*, 511 U.S. at 835). Instead, "[t]he [defendant] prison official must know of, and disregard, an excessive risk to inmate health or safety." *Id.* "[T]he Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should

have known)." *Darnell*, 849 F.3d at 29 (citing *Farmer*, 511 U.S. at 836-37). The Eighth Amendment requires subjective intent—meaning the defendant official must be "aware[] of the punishing act or omission" and disregard its risk to the prisoner. *See id.* at 32-33.

**2. Fourteenth Amendment**

While the Eighth Amendment applies to Plaintiff's post-conviction incarceration, the claims related to his time as a pretrial detainee are governed by the Fourteenth Amendment's Due Process Clause. *See id.* at 29 ("A pretrial detainee's claims are evaluated under the Due Process Clause because, '[p]retrial detainees have not been convicted of a crime and thus "may not be punished in any manner—neither cruelly and unusually nor otherwise."'" (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

A pretrial detainee's claims brought under the Fourteenth Amendment also have an objective and subjective component. The objective requirement under the Eighth Amendment and Fourteenth Amendment is the same. *Id.* at 30 ("Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health[.]'" (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). But the subjective requirement of a detainee's Fourteenth Amendment due process claim "is defined objectively," meaning that it may be established by showing that "a reasonable person knew or should have known" about the risk to the detainee's health or safety. *Id.* at 29, 35. A pretrial detainee may also establish a constitutional violation by showing that the deprivation was punitive. *Id.* at 34 n.12 ("A pretrial detainee can establish a due process

claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that those conditions are punitive.").

## II. Analysis

Plaintiff asserts three § 1983 claims for violations of his Eighth Amendment and Fourteenth Amendment rights: (1) a conditions of confinement claim; (2) a deprivation of medical care claim; and (3) an excessive force claim. (Dkt. 52 at ¶¶ 29-52).[4] Plaintiff seeks injunctive relief "prohibiting Defendants from subjecting him to further unlawful keeplock detention" and money damages. (*Id.* at ¶ 53). Defendants argue that the record does not support Plaintiff's allegations and each claim must therefore be dismissed. (Dkt. 101-2 at 7-25). For the reasons set forth below, the Court grants Defendants' summary

[4] Plaintiff also alleges that Defendants kept him in isolated confinement in violation of the HALT Act. (Dkt. 52 at ¶¶ 17, 37). Effective March 2022, the HALT Act amended New York Corrections Law to "limit[] segregated confinement to fifteen consecutive days and twenty days within any sixty-day period." *N.Y. State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022) (citing N.Y. Correct. Law § 137(6)(i)). It also prohibits segregated confinement for individuals with a physical, mental, or medical disability, except under certain circumstances prior to a disciplinary hearing. N.Y. Correct. Law § 137(6)(h). "Segregated confinement" is defined as "confinement of an incarcerated individual in any form of cell confinement for more than seventeen hours a day other than in a facility-wide emergency or for the purpose of providing medical or mental health treatment." *Id.* § 2(23).

It is unsettled whether the HALT Act provides a private right of action. *Compare Suarez v. Annucci*, No. 20 CV 7133 (VB), 2021 WL 6065765, at *13 (S.D.N.Y. Dec. 21, 2021) (holding that Corrections Law § 137(6) provides an implied private right of action), *with Correa v. Lynch*, No. 20-CV-02875 (PMH), 2021 WL 2036697, at *8 (S.D.N.Y. May 20, 2021) (noting that Corrections Law § 137(5) does not include a private right of action); *see also Rivera v. Molina*, No. 23-CV-4128 (LTS), 2023 WL 4847865, at *5 (S.D.N.Y. July 27, 2023) (observing that it is unsettled if § 137 includes a private right of action). The Court need not make this determination as Plaintiff does not assert a separate claim under the HALT Act, but only alleges Defendants violated its provisions as support for his claimed conditions of confinement claim. (*See* Dkt. 52 at ¶ 37).

judgment motion as to the deprivation of medical care claim against all Defendants, the conditions of confinement claim against Sheriff Virts, and the excessive force claim against Sheriff Virts, Sgt. Verplank, and Sgt. Hendler, but denies the motion as to the excessive force claim as asserted against Sgt. Crane and Sgt. Morrison and the conditions of confinement claim against Sgt. Crane, Sgt. Verplank, Sgt. Morrison, and Sgt. Hendler.

### A. Conditions of Confinement

Plaintiff's conditions of confinement claim is premised on the duration of his "keeplock status/solitary confinement, without appropriate access to mental health treatment and programs." (Dkt. 52 at ¶¶ 29-32). Because there is a question of fact as to whether Plaintiff's aggregated keeplock detentions were excessive in view of the penological justification, the Court denies Defendants' motion for summary judgment on this claim except as to Sheriff Virts.

#### 1. Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Singletary v. Russo*, 377 F. Supp. 3d 175, 185 (E.D.N.Y. 2019) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). "If no reasonable jury could find that a particular defendant was personally involved in causing a constitutional violation alleged by plaintiff, then summary judgment should be awarded to that defendant." *Id.*[5]

---

[5] While personal involvement is required in a § 1983 claim for an award of damages, there is authority for the principle that "the personal involvement requirement does not apply to bar actions pursuant to § 1983 for injunctive relief." *Lewis v. Cuomo*, No. 20-CV-6316 CJS, 2021 WL 5827274, at *11 n.9 (W.D.N.Y. Dec. 8, 2021); *see also Ratches v.*

After reviewing the record, Sherrif Virts is dismissed for a lack of personal involvement in Plaintiff's conditions of confinement claim, but the claim may proceed against the other Defendants. Sgt. Crane testified at his deposition that the hearing officer at an inmate's disciplinary hearing was the individual responsible for imposing an inmate's sanction. (Dkt. 101-8 at 54). The record shows that Sgt. Morrison was the only Defendant that served as a hearing officer. (*See* Dkt. 101-12 at 3, 8, 13, 22, 30, 35, 40, 45, 61, 66, 73, 159, 289). As Sgt. Morrison was personally involved in the imposition of the alleged unconstitutional conditions of confinement, he may be held liable on this claim. *Cf. Walker v. Velez*, No. 22 CV 7638 (VB), 2025 WL 2381701, at *7 (S.D.N.Y. Aug. 15, 2025) (holding that defendant was not personally involved and thus could not be liable on plaintiff's excessive solitary confinement claim where the record demonstrated defendant "did not issue the misbehavior report, hold the disciplinary hearing, confine plaintiff to the SHU, or hear the appeal.").

---

*Guerrera*, No. 3:24-CV-1319 (SVN), 2025 WL 437494, at *2 n.3 (D. Conn. Feb. 7, 2025) ("Personal involvement in the alleged constitutional violation is not a prerequisite to official capacity claims for injunctive relief."); *Hendrix v. Annucci*, No. 920CV0743GTSTWD, 2021 WL 4405977, at *15 (N.D.N.Y. Sept. 27, 2021) ("Although the Court finds (based on the current record) that Defendant Annucci was not personally involved in the alleged conduct giving rise to Plaintiff's Eighth Amendment claims and Fourteenth Amendment claim, Plaintiff may seek injunctive relief as to those claims against him."). Plaintiff does seek injunctive relief. (*See* Dkt. 52 at ¶ 53 (seeking injunctive relief "prohibiting Defendants from subjecting him to further, unlawful keeplock detention absent the provision of adequate mental health resources and a pre-detention evidentiary hearing.")). But because he is no longer housed at the Jail, any request for injunctive relief is moot. *See McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) ("An inmate's transfer from a prison facility moots his claims for declaratory or injunctive relief against officials of the transferring facility.").

Recent Second Circuit caselaw has also held that a plaintiff may establish liability on a § 1983 claim "based on a showing that [a] supervisor was 'directly involved in the incident itself' or 'failed to remedy a wrong after learning of' that wrong." *Suarez v. Morton*, No. 24-872, 2026 WL 741169, at *12 (2d Cir. Mar. 17, 2026) (quoting *M.B v. Reyes*, No. 97-2653, 1999 WL 147031, at *2 (2d Cir. Mar. 15, 1999)).[6] Sgt. Crane testified that the sergeant was a "supervisory" role that oversaw the corrections officers and reported to the lieutenant. (Dkt. 101-8 at 21-23). Except for Sherrif Virts, each Defendant was a sergeant when Plaintiff was held at the Jail. The extent that these Defendants had the capacity to remedy Plaintiff's potentially unconstitutional confinement in keeplock is not addressed in the record or in the Defendants' summary judgment papers, and therefore the Court cannot resolve that issue on the current record.

That said, the record is clear that each of these Defendants regularly interacted with Plaintiff or were otherwise aware of his mental health condition and keeplock confinement. Sgt. Crane frequently responded to Plaintiff's cell when an issue arose. (*See, e.g.*, Dkt. 101-12 at 34; Dkt. 101-8 at 110-11). Sgt. Hendler testified that he was aware of Plaintiff's keeplock sanctions and mental health conditions. (Dkt. 101-10 at 24, 36-37). Sgt. Hendler

---

6 To be sure, Second Circuit caselaw since 2020 had been clear that a defendant on a § 1983 claim may not be held liable on a theory of "supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[A] plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))). But in *Suarez v. Morton*, the Second Circuit Court of Appeals included the "fail[ure] to remedy a wrong after learning of that wrong" as a basis for finding a supervisor personally involved in an Eighth Amendment deliberate indifference to conditions of confinement claim. No. 24-872, 2026 WL 741169, at *12 (2d Cir. Mar. 17, 2026).

also testified that he was promoted to lieutenant in March 2022, during Plaintiff's third stint at the Jail, which expanded his responsibilities to include "the supervision of the sergeants." (*Id.* at 21). Sgt. Verplank had been a sergeant since at least 2002 (Dkt. 101-25 at 16) and testified that Plaintiff spent the majority of his time at the Jail in keeplock and that he had several interactions with Plaintiff (*id.* at 27, 30). Even though they did not personally impose any of the keeplock sanctions, whether Sgt. Crane, Sgt. Hendler, or Sgt. Verplank had the ability to correct Plaintiff's potentially unconstitutional confinement remains an outstanding issue that the Court is not able to resolve at this juncture.

By contrast, there is no evidence in the record that Sherrif Virts had any involvement in any of Plaintiff's alleged constitutional violations or that he was aware of Plaintiff's keeplock confinement. Although Plaintiff testified that he was included on at least one three-way call with Sherrif Virts and the mother of Plaintiff's child, nothing in Plaintiff's testimony indicates that Sherrif Virts was aware of Plaintiff's solitary confinement. (Dkt. 101-7 at 39-43). Accordingly, summary judgment is granted in favor of Sherrif Virts on this claim.

**2. Objective Component**

"For suits challenging conditions of confinement, the caselaw requires extreme deprivation, such as the denial of 'the minimal civilized measure of life's necessities.'" *Steele-Warrick v. Microgenics Corp.*, 671 F. Supp. 3d 229, 239 (E.D.N.Y. 2023) (quoting *Walker v. Schult*, 45 F.4th 598, 620 (2d Cir. 2022)). "Courts in this Circuit have held that . . . as a general rule, 'administrative segregation conditions, even though restrictive and harsh, are insufficient to establish Eighth Amendment violations because they are part of

the penalty that criminal offenders pay for their offenses against society.'" *Smith v. Annucci*, No. 6:18-CV-06261 EAW, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Tavares v. Amato*, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013)). Generally, the Second Circuit Court of Appeals has recognized that "whether incarceration in [isolated segregation] violates the Eighth Amendment . . . depends on the duration and conditions of the confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015) (emphasis added). Indeed, "[n]umerous cases in this circuit have upheld long [solitary confinement] sentences that were challenged only based on the amount of time prisoners were held in segregation." *Jay v. Venetozzi*, No. 15-CV-147S, 2020 WL 4382001, at *9 (W.D.N.Y. July 30, 2020).

That said, courts have found constitutional violations "where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation," *Smith*, 2019 WL 539935, at *6 (quoting *Peoples v. Fischer*, 898 F. Supp. 2d 618, 621 (S.D.N.Y. 2012)). One district court recently observed that "[t]he confines of an excessive [solitary] confinement claim are not clearly defined." *Bradshaw v. Uhler*, No. 921CV0901DNHML, 2023 WL 5795937 (N.D.N.Y. July 20, 2023), *report and recommendation adopted*, No. 9:21-CV-901, 2023 WL 5367520 (N.D.N.Y. Aug. 22, 2023). As noted, the objective element under the Eighth Amendment and Fourteenth Amendment is the same. *Darnell*, 849 F.3d at 30

Sgt. Crane testified at his deposition that keeplock detention limited Plaintiff to one hour of recreation each day and included access to the showers but otherwise confined Plaintiff to a cell for 23 hours a day. (Dkt. 101-8 at 26). Plaintiff also lost access to all

non-mandated programing, such as educational programs to obtain a GED. (*Id.* at 68-69). Standing alone, these conditions do not amount to a violation of Plaintiff's constitutional rights. *See, e.g.*, *Hamilton v. Fisher*, No. 9:10-CV-1066 MAD/RFT, 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) ("'[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation."), *report and recommendation adopted*, No. 9:10-CV-1066 MAD/RFT, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

But the total time Plaintiff spent in keeplock, in consideration of his mental health conditions, may constitute an objective deprivation under the Eighth and Fourteenth Amendments. Throughout his time at the Jail, Plaintiff was disciplined with keeplock sanctions ranging from three to ninety days. (Dkt. 101-1 at ¶¶ 28, 267). Caselaw in this circuit is clear that an individual 90-day sanction in solitary confinement by itself does not violate the Constitution. *See, e.g.*, *Bunting v. Fischer*, No. 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *4 (W.D.N.Y. Aug. 4, 2016) (Eighteen-month sentence in isolated confinement did not state Eighth Amendment claim), *report and recommendation adopted*, No. 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016); *Gulley v. Roach*, 02-CV-0908S, 2004 WL 2331922, at *12 (W.D.N.Y. Oct. 15, 2004) (holding that 214 days in "[solitary] confinement alone does not rise to the level of a constitutional violation")).

Sgt. Morrison testified that multiple keeplock sanctions are served consecutively. (Dkt. 101-9 at 60). Before his conviction, Plaintiff received 31 keeplock sanctions for an approximate cumulative sanction of 750 days in isolated detention—which exceeds the total number of days Plaintiff spent at the Jail during his first stint. (Dkt. 101-1 at ¶¶ 17-237). Indeed, Plaintiff alleges that his detention in keeplock was "continuous" during this

period. (Dkt. 52 at ¶ 16). During Plaintiff's third stint at the Jail, he received keeplock sanctions ranging from three to twenty-five days, for an approximate cumulative total of 143 days in keeplock. (Dkt. 101-1 at ¶¶ 267-72, 291, 309, 314, 334-35, 338, 343, 347, 356).

"Numerous courts have found that long stretches of segregation can constitute cruel and unusual punishment" where the sanction is "grossly disproportionate to the underlying offense." *Peoples*, 898 F. Supp. 2d at 625-26 (collecting cases). It is unclear whether a plaintiff may aggregate continuous solitary confinement sanctions to establish a deliberate indifference claim under the Eighth Amendment or Fourteenth Amendment. The summary judgment papers submitted by Defendants do not address this issue.

On a traditional conditions of confinement claim, Second Circuit caselaw is clear that a plaintiff may aggregate the particular ***conditions*** to establish an Eighth Amendment violation. *See Darnell*, 849 F.3d at 30 ("[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" (quoting *Walker*, 717 F.3d at 125)). A plaintiff may also aggregate time spent in solitary confinement to establish an "atypical and significant hardship" sufficient to create a liberty interest deprivation on a procedural due process claim. *See Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) ("[S]eparate [solitary confinement] sentences 'should be aggregated for purposes of the [procedural due process] inquiry' when they constitute a sustained period of confinement." (quoting *Sims v. Artuz*, 230 F.3d 14, 23-24 (2d Cir. 2000))). In the procedural due process context, the Second

Circuit Court of Appeals has recognized that "[c]onfinement in normal [solitary confinement] conditions for 305 days is . . . a sufficient departure from the ordinary incidents of prison life to require procedural due process protections. . . ." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). "Although the due process analysis is conceptually distinct from that of the Eighth Amendment, a finding of atypicality is, by analogy, indicative of whether a sentence is grossly disproportionate to the underlying offense." *Peoples*, 898 F. Supp. 2d at 625.[7]

Furthermore, courts have determined that the isolating conditions of excessive solitary confinement may violate the basic human needs of social interaction, environmental stimulation, and sanitation. *See, e.g.*, *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 379 (N.D.N.Y. 2020) (recognizing basic human needs of "social contact or environmental/sensory stimulation through the . . . ability to access recreational, educational, and other programs").

Although Plaintiff was not completely isolated during his keeplock confinement as he received regular mental health counseling sessions and psychiatric evaluations,[8] the

---

[7] Courts outside this circuit indicate that aggregating terms of solitary confinement is permissible to establish an objective deprivation—especially where the defendants are aware of a detainee's mental health conditions. *See Palakovic v. Wetzel*, 854 F.3d 209, 216-17, 226 (3d Cir. 2017) (holding on motion to dismiss that "multiple 30-day stints in solitary confinement" over thirteen months for mentally ill prisoner stated Eighth Amendment claim); *Diaz v. Wall*, No. CV 17-94 WES, 2018 WL 1224457, at *7 (D.R.I. Mar. 8, 2018) (holding that "repeated imposition" of solitary confinement on inmate with "diagnosed mental illness" stated an Eighth Amendment claim).

[8] To be sure, the record indicates there were time periods spanning several months in which Plaintiff did not receive this counseling. For example, the record indicates that Plaintiff did not receive mental health counseling from June 28 through September 20,

Court cannot conclude as a matter of law that his duration of keeplock confinement, which spanned approximately 750 days during Plaintiff's first stint at the Jail and 143 days during his third stint, did not violate his Fourteenth and Eighth Amendment rights. Therefore, the Court turns to whether Defendants' treatment of Plaintiff amounted to deliberate indifference.

**3. Subjective Component**

"As to the subjective element, the Supreme Court has noted that conditions satisfying the Eighth Amendment standard include 'those that are totally without penological justification.'" *H'Shaka*, 444 F. Supp. 3d at 380 (quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)); *see also Wesolowski v. Kamas*, 590 F. Supp. 2d 431, 434 (W.D.N.Y. 2008) ("Prison conditions are unconstitutional where they result in the 'unnecessary and wanton' infliction of pain and are 'totally without penological justification.'" (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981))), *aff'd*, 409 F. App'x 476 (2d Cir. 2011). "The ability to maintain the safety of the inmates and the officers is a legitimate penological interest." *Booker v. Maly*, No. 9:12-CV-246 NAM/ATB, 2014 WL 1289579, at *19 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 F. App'x 82 (2d Cir. 2015).

This applies to Fourteenth Amendment claims as well. *See Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55-56 (2d Cir. 2017) ("[A] pretrial detainee's placement in a restrictive housing status like Administrative Segregation may be determined to be

---

2016. (Dkt. 101-1 at ¶¶ 16-31). Similarly, Plaintiff did not receive mental health counseling from December 29, 2017, until he was transferred out of the Jail after his conviction on March 12, 2018. (*Id.* at ¶¶ 232-38).

reasonably related to legitimate governmental purposes. . . . [such as where] detainees posed a risk to institutional security, and where the measures were not excessive in relation to that purpose."). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). "To determine whether a pretrial detainee's conditions of confinement are punitive in violation of the detainee's substantive due process rights '[a] court must decide whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Edwards v. Dawson*, No. 3:24-CV-1821 (VDO), 2025 WL 1733246, at *5 (D. Conn. June 20, 2025) (quoting *Almighty Supreme Born Allah*, 876 F.3d at 55).

The undisputed facts before the Court show that each keeplock sanction imposed on Plaintiff was the result of his disciplinary misconduct. For example, during Plaintiff's first stint, he was sentenced with 30 days in keeplock after pleading guilty to shouting "I'll cut you C.O.'s up" at a corrections officer. (Dkt. 101-12 at 61-64). As another example, on October 2, 2017, Plaintiff was sanctioned with 30 days in keeplock for saying he would kill anyone that came in his cell and throwing his meal tray at his cell door. (Dkt. 101-16 at 276-85). Plaintiff's 90-day keeplock sanction was imposed after he "poked" a corrections officer in the head through his cell bars and fought with the officers when they entered his cell. (Dkt. 101-12 at 45-48).

Plaintiff engaged in similar conduct during his third stint. On May 18, 2021, Plaintiff was involved in a fight among inmates and pushed a corrections officer. (Dkt.

101-14 at 163). He also hit another inmate in the face that day. (*Id.* at 159). Plaintiff received 12 and 15 days in keeplock as a sanction for these violations. (Dkt. 101-18 at 33-34).

Defendants argue that Plaintiff's conduct rendered his keeplock sanctions "both lawful and necessary." (Dkt. 101-2 at 10). But when Plaintiff's periods of keeplock confinement are viewed in the aggregate, the Court cannot conclude as a matter of law that the cumulative time spent in isolated detention (750 days and 143 days) served a legitimate penological interest—especially in light of Plaintiff's well-documented and well-known mental health issues. *See Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) ("[M]ultiple 30-day stints in solitary confinement" for mentally ill prisoner stated conditions of confinement claim based on deliberate indifference). In other words, a reasonable jury could find that even if each individual sanction was justified based on Plaintiff's conduct, the repeated cumulative nature of the sanctions were beyond the scope of the stated penological justification and were imposed as an impermissible punitive measure. The record also shows that there were two months-long gaps when Plaintiff did not receive mental health counseling. (*See* Dkt. 101-1 at ¶¶ 16-31; 232-38). No explanation for this is offered by Defendants and the Court's review of the record does not shed light on that question. Whether the mental health treatment was withheld for punitive reasons is not clear.

Furthermore, the record shows that each Defendant, except for Sherrif Virts, was aware of both Plaintiff's keeplock detention and his mental health issues. Indeed, at his deposition, Sgt. Verplank testified that he "may have spoken with mental health" about

Plaintiff's suicide attempts and the amount of time he was spending in keeplock. (Dkt. 101-25 at 58). Sgt. Hendler testified that by April 17, 2017, before Plaintiff's three suicide attempts, he was aware that Plaintiff "had several suicide constant watch notations in his file." (Dkt. 101-10 at 36-37). An informational report notes that Sgt. Morrison escorted Plaintiff to constant watch on August 9, 2017, because of a suicide letter Plaintiff wrote to his grandmother. (Dkt. 101-12 at 413). Sgt. Crane testified that he would have been notified about Plaintiff's October 3, 2017, suicide attempt even though he was not involved in responding to that event. (Dkt. 101-8 at 95). Moreover, the informational reports from the corrections officers that detail Plaintiff's suicide attempts on November 3 and November 22, 2017, indicate all sergeants were copied on the reports. (*See* Dkt. 101-12 at 84-87, 229-33).

On this record, the Court cannot agree with Defendants that they are entitled to summary judgment as a matter of law on Plaintiff's conditions of confinement claim. Questions of fact exist as to whether Plaintiff's cumulative keeplock sanctions during his first and third stints at the Jail constituted impermissible punishment without sufficient penological justification. Furthermore, it is unclear whether Plaintiff was denied mental health counseling sessions on two occasions as a punitive measure. The record also demonstrates that each Defendant (other than Sheriff Virts) was aware of Plaintiff's mental health issues, his prolonged detention in keeplock, and his multiple suicide attempts, yet the isolated confinement continued. As a result, the Court denies Defendants' motion for summary judgment on the conditions of confinement claim as asserted against Sgt. Crane, Sgt. Morrison, Sgt. Verplank, and Sgt. Hendler.

### B. Deliberate Indifference to Medical Care

Plaintiff also claims he was deprived of adequate medical care for his mental health, leading to his suicide attempts, and medical care related to a respiratory infection he contracted in 2021. (Dkt. 52 at ¶ 43). Defendants argue that Plaintiff received adequate medical care in both instances. (Dkt. 101-2 at 16-20). The Court agrees with Defendants.[9]

Similar to Plaintiff's conditions of confinement claim, the Eighth Amendment covers allegations related to Plaintiff's post-conviction claim (the respiratory infection), while the Fourteenth Amendment governs allegations related to his period of incarceration as a pretrial detainee (suicide attempts). *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) ("The [Supreme] Court subsequently extended the protections for convicted prisoners [for deliberate indifference to serious medical needs claims] to pretrial detainees under the Due Process Clause of the Fourteenth Amendment."). "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 837). The objective prong

---

[9] Plaintiff also alleges that "Defendants have refused requests that he receive prescribed medications or blood pressure checks" (Dkt. 52 at ¶ 23), but he does not incorporate this allegation into his deprivation of medical care claim (*see id.* at ¶¶ 42-47). Plaintiff makes no showing or allegation about how often Defendants were required to give his medication or monitor his blood pressure. Moreover, there is nothing in the record to indicate that any of the Defendants withheld any medications or refused to check his blood pressure when they were required to do so. Accordingly, to the extent that Plaintiff asserts a deprivation of medical care claim related to withheld medication or access to blood pressure monitoring, it is dismissed.

for a deliberate indifference claim arising out of medical care requires a showing of a "serious medical need." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). As with the conditions of confinement claim, "[a] detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Darby*, 14 F.4th at 128 (quoting *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019)).

**1. Mental Health**

Plaintiff alleges that Defendants "were aware of [his] mental health problems but repeatedly and inhumanely ignored his requests for help," resulting in his suicide attempts. (Dkt. 52 at ¶¶ 43-44). Defendants do not address and thus do not contest that Plaintiff's mental health condition was a serious medical need. But Defendants argue that this claim must be rejected because Plaintiff received appropriate mental health programing and treatment. (Dkt. 101-2 at 17-21). Because the record is clear that Defendants did not ignore Plaintiff's requests for mental health treatment prior to his suicide attempts,[10] Defendants are entitled to summary judgment on this claim.

---

[10] Even though there were two gaps in the mental health counseling sessions (Dkt. 101-1 at ¶¶ 16-31, 232-38), the first occurred over a year before Plaintiff's first suicide attempt and the second gap occurred after the final suicide attempt. Between the first gap in counseling sessions and Plaintiff's first suicide attempt, he received over a hundred individual counseling sessions. On these facts, Plaintiff cannot prove that the missing appointments over a year before his suicide attempts constitute deliberate indifference

"In the context of an inmate's risk of suicide, the subjective element of the deliberate indifference standard requires a dual showing that the defendant: [1] subjectively knew the prisoner was at substantial risk of committing suicide; and [2] intentionally disregarded that risk." *Est. of King by & through King v. Annucci*, 693 F. Supp. 3d 310, 325 (N.D.N.Y. 2023) (citation modified). As noted above, Plaintiff may also establish that the defendant "should have known" of the risk to sustain a Fourteenth Amendment claim. *Darby*, 14 F.4th at 128.[11]

The record plainly establishes that Defendants did not disregard Plaintiff's risk of committing suicide. Upon Plaintiff's initial entry to the Jail in March 2016, he was screened by the Wayne Behavioral Health Network for his risk of suicide based on a past suicide attempt. (Dkt. 101-1 at ¶ 10). That screening assessed Plaintiff to be a "moderate" risk of harm to himself and others. (*Id.*). Indeed, the Court's review of the record reveals that Plaintiff denied any present suicide attempts or suicidal thoughts at that time, and Plaintiff was scheduled to attend biweekly mental health counseling sessions after that initial screening, with additional sessions permitted as requested or otherwise warranted. During Plaintiff's first stint at the Jail, he attended approximately 151 individual mental

---

leading to his suicide attempts, when he received over a hundred counseling sessions before those attempts. Furthermore, the gap in counseling sessions that occurred after the suicide attempts cannot serve as the basis for his deliberate indifference to medical care claim based on the suicide attempts.

[11] Similar to the conditions of confinement claim, Defendants contend that Sheriff Virts lacked personal involvement in Plaintiff's medical care. (Dkt. 101-2 at 16). There is no evidence in the record that Sheriff Virts was personally aware of Plaintiff's mental health condition or risk of committing suicide. Thus, lack of personal involvement would serve as a separate basis to dismiss this claim against Sheriff Virts.

health counseling sessions. (Dkt. 101-1 at ¶¶ 11-238). Many of these sessions were either made at Plaintiff's request (*see, e.g.*, *id.* at ¶¶ 189-90) or based on a referral from a sergeant or corrections officer (*see, e.g.*, *id.* at ¶¶ 146, 182). Plaintiff also met with a psychiatrist for a psychiatric evaluation or follow-up appointment roughly a dozen times during his pretrial detention. (*Id.* at ¶¶ 15, 32, 35, 43, 47, 58, 61, 70, 83, 94, 109, 227).

The record shows that Plaintiff attempted to commit suicide or otherwise hurt himself on three occasions: October 3, 2017, November 3, 2017, and November 22, 2017. On October 3, 2017, corrections officers responded to Plaintiff's cell after he was discovered with a bed sheet tied around his neck. (Dkt. 101-16 at 83-84). The responding officers untied and removed the bed sheet, placed restraints on Plaintiff's wrists and ankles and escorted him to a separate area for constant watch. (*Id.* at 82-92). Plaintiff received individual counseling sessions for the next three days and the Court's review of the record reveals that Plaintiff was cleared from constant watch by the mental health staff after he denied suicidal ideation. (Dkt. 101-1 at ¶¶ 172, 175-76).

On November 3, 2017, corrections officers again discovered Plaintiff in his cell with a bedsheet tied around his neck. (Dkt. 101-1 at ¶ 196). Several corrections officers and Sgt. Verplank responded, and Plaintiff was observed to be unresponsive. (Dkt. 101-16 at 243-55). A corrections officer lifted Plaintiff to relieve the pressure of the sheet while a second corrections officer untied the sheet. (*Id.* at 244). After Plaintiff was assisted onto his bed, the corrections officers reported that he "became angry and started hitting his head [against] the cell wall." (*Id.*). The corrections officers restrained Plaintiff with handcuffs and ankle shackles and escorted him to the medical facility where he was placed on

constant watch. (*Id.*). A mental health aide met with Plaintiff that day while he was on constant watch and did not clear Plaintiff to return to his cell. (Dkt. 101-1 at ¶ 197). The mental health aide followed up with Plaintiff three days later and cleared him from constant watch. (*Id.* at ¶ 198).

A similar series of events transpired on November 22, 2017. Plaintiff was again discovered in his cell with a bed sheet tied around his neck and corrections officers and Sgt. Crane responded to remove the sheet. (Dkt. 101-1 at ¶¶ 206-07; Dkt. 101-12 at 84-88). There was a physical altercation between the responding corrections officers and Plaintiff, and the corrections officers applied handcuffs and shackles and escorted Plaintiff out of his cell to be placed on constant watch. (Dkt. 101-1 at ¶¶ 209-10; Dkt. 101-12 at 84-88). A mental health aide met with Plaintiff that day but did not clear him from constant watch. (Dkt. 101-1 at ¶ 211). The Court's review of the record reveals, however, that mental health staff cleared Plaintiff from constant watch on November 27, 2017. Plaintiff attended a mental health counseling session the day before each suicide attempt. (Dkt. 101-1 at ¶¶ 169, 193, 205).

Plaintiff also alleges that he told a corrections officer named "Rose" on December 9, 2017, that he was going to kill himself and that this statement was ignored. (Dkt. 52 at ¶ 20). There is no proof of this in the documentary records and, as noted above, there are several instances when corrections officers or sergeants referred Plaintiff to mental health counseling or constant watch when he expressed thoughts of self-harm (Dkt. 101-1 at ¶¶ 146, 262, 277, 286-87, 292, 327, 337, 354, 367), including on April 12, 2017 (*id.* at ¶ 77). The record also indicates that Plaintiff received individual counseling sessions on

December 8, 2017, and December 11, 2017, and denied suicidal ideations at both sessions. (Dkt. 101-1 at ¶ 221-22). Moreover, a corrections officer named "Rose" is not a Defendant in this action.

The Court therefore concludes that although Plaintiff presented a clear risk of suicide, the record firmly establishes that Defendants were not deliberately indifferent to this risk by not providing adequate medical care. Based on the number of counseling sessions, psychiatric evaluations, prescribed medications, and transfers to constant watch, Defendants did not fail to provide mental health treatment to Plaintiff. As there is no genuine dispute of the material facts, Defendants are entitled to summary judgment on this claim.

**2. Respiratory Infection**

Plaintiff also claims that Defendants were deliberately indifferent to his need for medical care regarding a respiratory infection he contracted "in or about December 2021." (Dkt. 52 at ¶¶ 24, 43). As this allegation relates to Plaintiff's post-conviction period of incarceration, it is governed by the Eighth Amendment. Defendants do not address whether the respiratory illness constitutes a "serious medical need," but the Court agrees with their argument that the record conclusively establishes that Defendants were not deliberately indifferent to Plaintiff's respiratory illness.

First, there is nothing in the record to indicate that any Defendant was aware that the respiratory infection presented a substantial risk of serious harm to Plaintiff's health. Indeed, the verified complaint does not identify *any* Defendant who was personally involved in this claim. Second, any potential risk to Plaintiff's health was not disregarded

because he was transferred to a local hospital in early January. (Dkt. 101-1 at ¶ 336). Plaintiff arrived at the hospital complaining of chest tightness and coughing up blood. (*Id.*). After examination by the hospital, Plaintiff was discharged back to the Jail the same day. (*Id.*). Neither the fourth amended complaint nor the record indicate that Plaintiff had further complaints related to his respiratory infection.

Moreover, the time between when Plaintiff allegedly contracted the respiratory infection (December 2021) and when he was transported to the hospital (January 9, 2022), indicates that Defendants were not deliberately indifferent to his condition. The relatively brief timeframe does not support Plaintiff's contention that Defendants' actions constituted cruel and unusual punishment. *See Campbell v. Belgard*, 765 F. Supp. 3d 234, 245 (W.D.N.Y. 2025) (one month delay in treatment was not indicative of Eighth Amendment violation), *appeal filed*, No. 25-763 (2d Cir. April 3, 2025); *cf. Stevens v. Goord*, 535 F. Supp. 2d 373, 389 (S.D.N.Y. 2008) (holding that the physician's decision not to pursue a course of treatment, "given the pain and discomfort that plaintiff continued to suffer for approximately *eight additional months* as a result, [went] beyond mere 'negligence' and serve[d] as an additional basis for plaintiff's constitutional claim" (emphasis added)).

**C. Excessive Force**

Finally, Plaintiff claims that Defendants used excessive force against him while he was a detainee. (Dkt. 52 at ¶ 48). Plaintiff asserts that Defendants "maliciously and sadistically . . . cause[d] [Plaintiff] further, unwarranted harm by placing him in a choke hold, using mase [sic] on his face, and beating him as he regained consciousness" following

his suicide attempt in 2017.[12] (*Id.*). As Plaintiff was a pretrial detainee at this time, his excessive force claim is governed by the Fourteenth Amendment's Due Process Clause.

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). To establish a violation, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). The detainee thus need not establish the defendant's state of mind. *Id.* at 396. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham*, 490 U.S. at 396).

A plaintiff may prevail on a Fourteenth Amendment excessive force claim "by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Id.* at 398 (quoting *Bell*, 441 U.S. at 561). As there is a genuine dispute of the facts surrounding this claim, the Court denies Defendants' summary judgment motion on the excessive force claim as asserted against Sgt. Crane and Sgt. Morrison.[13]

---

[12] Plaintiff does not specify which 2017 suicide attempt is connected to his excessive force claim but based on the allegations of the use of a choke hold and mace after regaining consciousness, the claim appears connected to the November 22, 2017, suicide attempt. Plaintiff alleges a similar incident occurred on January 25, 2018, in which Sgt. Crane again placed him in a headlock while other officers hit and maced him. (Dkt. 52 at ¶ 22). But Plaintiff does not incorporate this allegation into his excessive force claim, which explicitly relates to Plaintiff's "suicide attempt in 2017." (*See id.* at ¶¶ 48-52). The Court therefore does not construe the fourth amended complaint to assert an excessive force claim relating to Sgt. Crane's alleged conduct on January 18, 2018.

[13] According to the incident reports regarding this event, Sgt. Crane and Sgt. Morrison were the only named Defendants involved in Plaintiff's November 22, 2017, suicide

On November 22, 2017, several corrections officers and Sgt. Crane responded to Plaintiff's cell to untie the bed sheet around Plaintiff's neck. (Dkt. 101-1 at ¶ 206). According to Defendants, the corrections officers attempted to assist Plaintiff sit up-right, at which point Plaintiff "lunged" at Sgt. Crane and "attempted to strike him." (*Id.* at ¶ 207). Sgt. Crane then placed Plaintiff in a "headlock" while the other officers attempted to restrain Plaintiff with handcuffs and ankle shackles. (*Id.* at ¶¶ 208-09; Dkt. 101-8 at 111). The corrections officers transported Plaintiff to a different area, identified as "Lower K," and placed him on constant watch. (Dkt. 101-1 at ¶¶ 209-10; Dkt. 101-12 at 84). The incident reports from the responding corrections officers indicate that officers sprayed Plaintiff with pepper spray twice during this altercation and placed him in a "behavior modification suit." (Dkt. 101-12 at 84-90). The first use of pepper spray was administered by Sgt. Morrison while Plaintiff was still in his cell. (*Id.* at 89). The second application occurred while Plaintiff was in Lower K; the corrections officer "administered a short burst of [pepper] spray to [Plaintiff's] face" as the handcuffs were removed. (*Id.* at 90)

Plaintiff's version of this event is much different than Defendants' version. In the fourth amended complaint, Plaintiff contends that he lost consciousness with the bed sheet around his neck and when he regained consciousness he was handcuffed and shackled, and Sgt. Crane had him in a headlock that compromised his ability to breathe. (Dkt. 52 at ¶ 19).

---

attempt and ensuing altercation. (Dkt. 101-12 at 83, 88). Plaintiff does not specifically identify Sgt. Morrison in his excessive force claim, but asserts that claim against all Defendants. (*See* Dkt. 52 at ¶¶ 48-52). As Sheriff Virts, Sgt. Verplank, and Sgt. Hendler were not involved in this incident, Plaintiff's excessive force claim against them is dismissed.

According to Plaintiff, Sgt. Crane then ordered the corrections officers to beat him and use pepper spray on him. (*Id.*). At his deposition, Plaintiff denied that he attacked any of the corrections officers, but stated he tried to defend himself. (Dkt. 101-7 at 69). Plaintiff also denied he made any threatening statements to the corrections officers during this altercation. (*Id.* at 69-70).

Given the conflicting versions of events and viewing the record in a light most favorable to Plaintiff as the non-moving party, there is a genuine dispute of material fact regarding Plaintiff's excessive force claim. The parties agree that Sgt. Crane used a headlock during this altercation and Sgt. Morrison applied pepper spray. Plaintiff further contends that Sgt. Crane ordered the corrections officers to attack him. The Court cannot conclude on this record that a reasonable jury could not agree with Plaintiff's account and find that the use of force was taken without a legitimate government interest or constituted excessive measures. *See Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) ("[I]f a jury credited [plaintiff's] version of the events and determined that [defendant] applied pepper spray after [plaintiff] . . . was offering no physical resistance of police commands, it might well conclude that the use of that pepper spray was unreasonable under the circumstances."). Accordingly, summary judgment as to Plaintiff's excessive force claim as asserted against Sgt. Crane and Sgt. Morrison is denied.

## III. Qualified Immunity

### A. Conditions of Confinement

Defendants argue that they are entitled to qualified immunity on Plaintiff's conditions of confinement claim because "the Halt Act did not go into effect until March 2022" and therefore it was not "clearly established that it was a violation for an inmate to be constantly locked up after continuously breaking the rules." (Dkt. 101-2 at 25-26). But whether a right was "clearly established" is based on the federal right, not a state law. *See Bellatoni v. Lamont*, 671 F. Supp. 3d 140, 146 (D. Conn. 2023) ("[E]ven if [defendant] did violate state law, that is not the relevant inquiry for purposes of qualified immunity."). The HALT Act has no bearing on the qualified immunity analysis. The Second Circuit has "repeatedly held, that a state statute does not serve as 'clearly established law' for purposes of qualified immunity." *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019). Because Defendants make no other argument in support of qualified immunity on the conditions of confinement claim, the request for dismissal based on qualified immunity is denied.

### B. Excessive Force

Defendants also contend that Sgt. Crane and Sgt. Morrison[14] are entitled to qualified immunity on the excessive force claim because there is "no constitutional right to assault

---

[14] Defendants do not explicitly include Sgt. Morrison in their argument in favor of qualified immunity on the excessive force claim. As noted above, the Court construes the fourth amended complaint to assert this claim against Sgt. Morrison even though he was not individually identified in the pleading because that claim is asserted against all Defendants and the record indicates Sgt. Morrison was involved in the incident underlying Plaintiff's excessive force claim. The Court will therefore also construe Defendants' qualified immunity argument to include Sgt. Morrison.

an individual much less a corrections sergeant." (Dkt. 101-2 at 25). While true, there are issues of fact as to whether that is what happened.

Qualified immunity "shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Where the circumstances are in dispute, and 'contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness,' a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002) (quoting *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001)); *see also Curry v. City of Syracuse*, 316 F.3d 324, 334-35 (2d Cir. 2003) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain[.]" (quoting *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998))).

As noted above, the facts concerning the events of November 22, 2017, are disputed and cannot be resolved on this record as a matter of law. In other words, there are disputes as to whether it was Sgt. Crane and Sgt. Morrison assaulting Plaintiff or vice-versa. Thus, the Court denies Defendants' request to dismiss the excessive force claim on qualified immunity grounds.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 101) is granted in part and denied in part. Plaintiff's Eighth Amendment and Fourteenth Amendment conditions of confinement claim may proceed against Sgt. Crane, Sgt. Morrison, Sgt. Verplank, and Sgt. Hendler. Plaintiff's Fourteenth Amendment excessive force claim based on the events of November 22, 2017, as asserted against Sgt. Crane and Sgt. Morrison, may also proceed. All other claims and defendants are dismissed. The Clerk of Court is directed to terminate Defendant Barry Virt as a defendant.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 30, 2026
Rochester, New York